733 So.2d 707 (1999)
Kimberly Mayon Lovas WILLIS, Plaintiff-Appellant,
v.
Carron Hanks DUCK, Defendant-Appellee.
No. 98-1898.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1999.
Rehearing Denied June 30, 1999.
*708 Charles Overton LaCroix, Alexandria, for Kimberly Mayon Lovas Willis.
Michael Hathorn Davis, Alexandria, for Carron Hanks Duck.
Before: DOUCET, C.J., COOKS, and PICKETT, JJ.
DOUCET, Chief Judge.
Plaintiff, Kimberly Mayon Lovas Willis appeals a judgment of the trial court dismissing her petition to change the custody of Plaintiff's minor son, Blake A. Mayon, from Defendant, Carron Hanks Duck, to herself. We affirm the judgment of the trial court.

FACTS
This case involves the custody of eleven year old Blake Mayon who was born, out of wedlock, to Kimberly Mayon on April 5, 1987. The dispute is between his mother, Kimberly Mayon Willis and Kimberly's sister, Carron Duck. Kimberly voluntarily, via Notarial Act, gave custody of Blake to Carron in December 1993. Thereafter, on January 14, 1994, Carron filed a petition for custody of Blake, docket No. CC 20009, in Juvenile Court in Rapides Parish, entitled State of Louisiana, in the Interest of Blake A. Mayon. A hearing on the petition was held on April 13, 1995, and after the introduction of testimony and evidence, custody of Blake was awarded to Carron Duck.
On March 18, 1998, Kimberly Mayon Willis filed a petition for change of custody in the Juvenile Court of Rapides Parish. The judge who reviewed the petition determined that the Juvenile Court did not have jurisdiction over the matter and transferred the matter to the docket of the Ninth Judicial District Court.
Trial of the matter took place on May 11 and 27, 1998. Written reasons for judgment were handed down June 2, 1998, and judgment in the matter, denying Plaintiffs requested change of custody, was signed July 6, 1998. After a motion for a new trial was denied, Plaintiff filed the instant appeal.

LAW AND DISCUSSION
First, Plaintiff argues that the judgment of the Juvenile Court in docket No. CC 20009 should be declared null and void as the Juvenile Court was without jurisdiction over the subject matter of Mrs. Duck's petition.
*709 We find the facts in this case strikingly similar to those in Girouard v. Halpin, 368 So.2d 1139, 1140-43 (La.App. 3 Cir.), writ denied, 369 So.2d 1377 (La.1979):
The general facts are that on October 20, 1975, while unmarried but living with Donald Chaisson, a married man, Ms. Halpin gave birth to the minor child, Brett Louis Halpin. On October 20, 1977, she had another illegitimate child, a daughter named Tanya. Ms. Halpin testified that Donald Chaisson, whom she married on February 28, 1978, is the father of the second child.
In early January of 1978, Ms. Halpin consented to give custody of Brett to her step-sister and her husband, Mr. and Mrs. Girouard, Jr. Ms. Halpin testified her reason was that she was working and couldn't pay babysitters. Witnesses for the Girouards testified that because of complaints to the Welfare Department about child abuse, Brett was about to be removed from Mr. Halpin's custody, so she consented to the Girouards taking the child. In any event, on January 17, 1978 the Girouards filed a summary proceeding in the district court alleging that Brett was in their home, having been placed there on January 13, 1976 by Ms. Halpin for the best interest of the child, and that they desired judgment awarding custody to them. Ms. Halpin was named defendant in the rule, and she was personally served. At the hearing on January 30, 1978, Ms. Halpin made no appearance. Judgment by default was entered on that date awarding the permanent care, custody and control of the child to Mr. Girouard, subject to reasonable visitation rights by Ms. Halpin.
On May 17, 1978, Ms. Halpin filed the present summary proceedings alleging that she gave the child to the Girouards only because of financial difficulties, that she is now married to Donald Chaisson who is employed, that they are able to care for the child, and that the best interest of the child will be served by changing custody to her.
JURISDICTION OF THE DISTRICT COURT
On appeal, Ms. Halpin contends the January 30, 1978 judgment of the district court awarding custody to Mr. Girouard is null and void for lack of jurisdiction of the subject matter. She argues that the district court has jurisdiction of a child custody suit by a non-parent against a parent only by writ of habeas corpus, and since this was neither a habeas corpus action nor a proceeding in juvenile court, the prior judgment is null.
This precise question of jurisdiction appears to be res nova in the appellate courts of Louisiana. A discussion of the problem begins with the constitutional and statutory provisions. Article 5, Section 16 of the Louisiana Constitution of 1974 provides in part: "Except as otherwise authorized by this constitution, a district court shall have original jurisdiction of all civil and criminal matters." Article 5, Section 18 provides: "Notwithstanding any contrary provision of Section 16 of this Article, juvenile and family courts shall have jurisdiction as provided by law." These are essentially the same provisions as were contained in Article VII, Sections 35 and 52 of the Louisiana Constitution of 1921 as to jurisdiction of district and juvenile courts.
LSA-C.C.P. Article 10(5) provides:
"Art. 10. Jurisdiction over status
"A court which is otherwise competent under the laws of this state has jurisdiction of the following actions or proceedings only under the following conditions:
"(5) A proceeding to obtain the legal custody of a minor if he is domiciled in, or is in, this state;"
LSA-R.S. 13:1570 provides the jurisdiction of juvenile courts as follows:

*710 "Except as otherwise provided herein, the court shall have exclusive original jurisdiction in proceedings:
"A. Concerning any child whose domicile is within the parish or who is found within the parish;
"(1) Whose parent or other person legally responsible for the care and support of such child neglects or refuses, when able to do so, to provide proper or necessary support, education as required by law, or medical, surgical or other care necessary for his well-being; or who is abandoned by his parent or other custodian; or who is otherwise without proper care, custody or support;...." (This portion of the statute has been in effect since added by Act 73 of 1973.)
In Griffith v. Roy, 263 La. 712, 269 So.2d 217 (1972), a grandfather brought an action in district court alleging his grandchildren were neglected by their mother following the divorce of the children's parents. He sought custody. By default judgment the grandfather was awarded custody. Later, the mother filed a writ of habeas corpus action in the district court seeking custody. The majority opinion in the Supreme Court held that although the grandparent's prior suit was styled a custody proceeding, it was actually a suit by a third party to have a child declared "neglected", and that such a suit could only be brought in the juvenile court under Article 7, Section 52 of the Louisiana Constitution of 1921. The court annulled the prior judgment awarding custody to the grandparent and remanded the case to the trial court for further proceedings in the mother's application for writ of habeas corpus.[1]
In footnote 5, at page 222 of 269 So.2d, the majority noted that its holding was limited to jurisdiction of neglect cases, and that it was not deciding the propriety of an action by a third party or by a parent in district court for custody. Footnote 5 states:
"5. In this opinion we are determining only jurisdiction. The question of whether a third party has a right or cause of action to institute a suit which is in substance as well as style a civil proceeding for custody of minor children is not before the court. Neither do we reach the question of a third party's rights in civil custody proceedings pending between parents."
Thus, Griffith v. Roy does not prohibit the suit by Mr. Girouard against Ms. Halpin in district court for custody.
In Griffith v. Roy, Justice Dixon wrote a strong dissent in which he took the position that the grandparent's original suit was a civil suit for child custody of which the district court had jurisdiction under its unlimited jurisdiction in civil matters provided by Article 7, Section 35 of the Louisiana Constitution of 1921. Justice Dixon was of the view that the grandparent's suit was not to have the child declared "neglected", because the child was in the custody of the *711 grandparent and was being well cared for, citing In re Sherrill, 206 La. 457, 19 So.2d 203 (1944) for the rule that a juvenile court has jurisdiction of a "neglected" child only where the child is in a present state of neglect. Justice Dixon's view was also that the juvenile court has exclusive jurisdiction only where the state is a party in a suit involving a "neglect complaint" in juvenile court.
In the subsequent Court of Appeal decision in Stuckey v. Stuckey, 276 So.2d 408 (La.App.2d Cir.1973), a suit for separation from bed and board, the court held both parents unfit and awarded custody pendente lite to the grandparents. In answer to the contention by the mother on appeal that under Griffith v. Roy, supra, the district court had no jurisdiction to award custody to grandparents in preference to natural parents, the Court of Appeal pointed out that Griffith v. Roy does not hold that district courts lack jurisdiction to award custody to a non-parent in preference to a parent, the Supreme Court decision in Griffith v. Joy[Roy], being limited to a holding that a suit by a third party to have a child declared to be "neglected" must be filed in the juvenile court. The Court of Appeal in Stuckey pointed in particular to Footnote 5 in the opinion in Griffith, quoted above.
In Wood v. Beard, 290 So.2d 675 (La.1974), the mother filed in district court a petition for writ of habeas corpus to recover the custody of her child from the grandparents. The district court awarded custody to the grandparents based on the best interest of the child. The Court of Appeal affirmed, 280 So.2d 567 (La.App.3rd Cir.1973), holding Griffith v. Roy not controlling. In the Supreme Court, the mother argued that the district court was without jurisdiction to inquire into her fitness, citing Griffith v. Roy, supra. The Supreme Court held that in a habeas corpus action by a parent against a non-parent, the district court does have jurisdiction to consider the fitness of the parent and to award custody on the basis of the best interest of the child. However, the Supreme Court held on the merits that the mother was not shown to be unfit and that the best interest of the child required that custody be awarded to the mother. In discussing the question of jurisdiction the court stated:
"Plaintiff argues that only the juvenile courts have jurisdiction to interfere with parental authority. This is too narrow an interpretation of Griffith v. Roy, supra. We have previously held that the juvenile courts do not have jurisdiction over a dispute between private litigants for custody of a child not within the purview of R.S. 13:1570 et seq. In re Sherrill, 206 La. 457, 19 So.2d 203; 19 Tul.L.Rev. 464. Plaintiff's ultimate argument is that the result of Griffith v. Roy, supra, is that no court may inquire into the fitness of a parent seeking custody while the marriage is in existence and there is no separation or divorce action pending. This argument ignores the universally recognized proposition that the state and its courts are always concerned with the welfare of the child."
The only substantial difference between Wood v. Beard and the suit by Mr. Girouard against Ms. Halpin is that in Wood v. Beard the litigation was initiated by a petition for habeas corpus filed by the mother, whereas Mr. Girouard filed a civil suit by summary proceedings. As we construe the rationale of Wood v. Beard, it is not essential that the custody issue be brought before the district court by a writ of habeas corpus. The rationale of Wood v. Beard appears to be that the juvenile court does not have exclusive jurisdiction in a custody dispute between a parent and a non-parent where the child is not in a present state of neglect, requiring that the state protect the welfare of the child. In a situation where, as here, the child was not in a state of neglect but was *712 being well cared for by Mr. Girouard the juvenile court does not have exclusive jurisdiction. We are impressed by the reasoning to this effect contained in the dissent by Justice Dixon in Griffith v. Roy. Justice Dixon expresses this same rationale as the author of the Supreme Court opinion in Wood v. Beard. Justice Barham, the author of Griffith v. Roy, dissented in Wood v. Beard, urging that under LSA-R.S. 13:1570 the juvenile court has exclusive jurisdiction in a custody dispute between a parent and a non-parent. However, no other justice joined in Barham's dissent.
Thus this court has found the juvenile court and the district court have concurrent jurisdiction in cases such as the one presently before us. We are not the only circuit to so find. In O'Brien v. Shepley, 451 So.2d 82, 84 (La.App. 5 Cir.1984), our brethren of the Fifth Circuit stated:
While recognizing the specificity of the Girouard holding, we agree with its rationale. The Girouard court indicates, and we agree, that in cases involving questions of neglect, especially where the state is a party to an action, juvenile courts have exclusive jurisdiction. From our review of Louisiana caselaw, it appears that in other cases pertaining to custody and issues incidental to the custody of a child, district courts and juvenile courts have concurrent jurisdiction.
Accordingly, we find this argument to be without merit.
Next, Appellant argues that the trial court erred in placing the burden of proof on her to show a change in circumstance and that a change in custody would be in the best interest of Blake. In his "Written Reasons For Judgment" the trial judge stated as follows:
Under La. C.C. article 133, "if an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment." See also "comments1993" under the article, particularly paragraph (b).
However, at a subsequent hearing to change custody brought by the natural parent previously deemed unfit, the burden of proof should rest on that natural parent to demonstrate that he or she has rehabilitated and that facts which gave rise to him or her being deprived of custody at the initial hearing no long exist. Gordy v. Langer[Langner], 502 So.2d 583 (La.App. 3rd Cir., 1987); Guidry v. Guidry, 441 So.2d 384 (La.App. 5th Cir., 1983). See also Robert v. Gaudet, 691 So.2d 780 (La.App. 1st Cir., 1997) which requires the non-custodial parent to show "a change in circumstances and that the change in custody would be in the best interest of the child."
After considering the petitioner forfeiting her rights to parenthood of Blake in 1993, the above stated jurisprudence and Duck-2, the Court shall place the burden of proof on petitioner as stated in Gordy and Guidry and not impose the burden required in La. C.C. article 133 upon the defendant.
Therefore, for the petitioner to prevail in this action, she has to prove:
(1) She has rehabilitated;
(2) The facts which gave rise to her being deprived of custody at the initial hearing no longer exist, and
(3) A change in custody would be in the best interest of the child.
Blake originally came into the care of Carron Duck via a notarial act executed by Kimberly Mayon Lovas (now Willis) in December 1994. Thereafter, on April 13, 1995, the Juvenile Court of Rapides Parish, in docket No. CC20009, rendered a judgment awarding custody of Blake to Carron Duck. Although we do not have the transcript of that proceeding, the *713 court minutes reflect that Ms. Willis (who was known at the time as Kimberly Lovas) was represented by a curator, that an assistant district attorney was present and that testimony was received.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child, and that the best interest of the child requires an award of custody to the nonparent. Bolding v. Bolding, 532 So.2d 1199 (La. App. 2d Cir.1988). However, after an initial considered decree, the parent's paramount right to custody must be weighed in conjunction with the principles expressed in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Specifically, the concern for terminating repeated litigation and continuing a child in an established living environment. Bergeron applies to all attempts to modify custody following an earlier considered decree, including a dispute between a parent and a nonparent. Sheppard v. Hood, 605 So.2d 708 (La.App. 2d Cir.1992).
A considered decree is one in which evidence as to parental fitness to exercise custody is received by the court. Myers v. Myers, 561 So.2d 875 (La.App. 2d Cir.1990). Therefore, a parent seeking custody of a child awarded to a nonparent by a previous considered decree bears the burden of proving that the continuation of present custody is so deleterious to the child as to justify a modification of the custody, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages a change affords the child. Bergeron, supra; Oglesby v. Oglesby, 25,974 (La.App.2d Cir. 8/17/94), 641 So.2d 1027; Odom v. Odom, 606 So.2d 862 (La.App. 2d Cir.), writ denied, 608 So.2d 153 (La.1992). A custody decree entered by default, or that is not contested, or by consent of the parties is not a considered decree. Oglesby v. Oglesby, supra; Odom v. Odom, supra; Norris v. Norris, 604 So.2d 107 (La.App. 2d Cir.1992). If the record is silent regarding whether the issue of custody has been litigated, the court will presume that the prior decree was uncontested, and hence, not a considered decree. Odom v. Odom, supra.

Tennessee v. Campbell, 28,823, pp. 6-7 (La. App. 2 Cir. 10/30/96); 682 So.2d 1274, 1278.
Just last year the Louisiana Supreme Court had occasion to remind us that:
As earlier stated, the paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131. However, in actions to change custody decisions rendered in considered decrees, an additional jurisprudential requirement is imposed. Hensgens v. Hensgens, 94-1200 (La. App. 3 Cir. 3/15/95); 653 So.2d 48, writ denied, 95-1488 (La.9/22/95); 660 So.2d 478. A considered decree is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. Hensgens, 653 So.2d at 52. When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is "so deleterious to the child as to justify a modification of the custody decree," or of proving by "clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child." Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986), reh'g denied (Sept. 11, 1986).
Evans v. Lungrin, 97-0541, pp. 12-13, (La.2/6/98); 708 So.2d 731, 738.
Since both the minutes and the judgment of the juvenile court indicate that evidence was received before it granted custody of Blake to Mrs. Duck, it is clear that the juvenile court judgment was a considered decree. Thus being the case, *714 the trial judge did apply the wrong standard of proof in this case. However, Appellant benefitted from his error, as he did not hold her to the high standard of proof established in Bergeron. Since the trial judge's error did not result in an erroneous judgment, we find it was harmless.
Finally, we turn our attention to Appellant's allegation that the trial judge erred in not granting either a change in custody or visitation.
The testimony and evidence paints a bleary picture of the early family life of both Plaintiff and Defendant and especially Blake. We quote from the testimony of Patricia Ann Tademy, a Clinical Social Worker, the only witness accepted by the court as an expert:
Yes, my history shows that, um, Blake, has, uh, two half brothers, um, same mother. They all have three different fathers. He is the oldest of the three children. His grandfather was a drug dealer, used crack and marijuana and also sold drugs. His grandmother abused prescription drugs, uh, mostly pain pills and has been hospitalized at Central State Hospital, uh, approximately three times. There was an uncle who was jailed for ten years for rape and drugs. Um, the biological mother was reportedly in LTI for three years after stealing credit cards and, uh, and stole cars and used drugs. There was another uncle who also used drugs, marijuana. It also revealed that from birth to age six, um, Blake was raised by his biological mother and, uh, now from age six to eleven by his maternal aunt. He, uh, lived a very nomadic lifestyle, uh, he lived in Bayou Vista, Morgan City, Patterson, McNary, Glenmora, Forest Hill, [and] Lake Charles. And now he, uh, lives out in the country, um, in Forest Hill with his aunt and uncle where there are very friendly neighbors, a Christian community, mostly working people, low to no significant crime. Uh, his biological mother is reportedly unemployed, um, but has a history of, uh, prostitution. Biological father is unknown. The aunt that he lives with now is a housewife. The uncle is retired and disabled but he is also a pastor. His relationship with, uh, his parents, uh, while growing up during the time, uh, he lived with his biological mother he was reportedly misused and abused physically, sexually and emotionally. He came from a very dysfunctional family situation, unstable, moved frequently uh, fearful, uh, to the extent that he would not go to the bathroom alone. [He] also experienced hallucinations. Uh, his relationship with his mother was poor, and, uh, with the stepfather and her [his mother's] male friends. [He had] no relationship with his biological father. Um, but he gets along well with his, uh, aunt and uncle where he resides now.
Ms. Tademy went on to state that Blake had described seeing his mother prepare a Coke can and smoke marijuana with the can. She further stated that Blake related he had engaged in the use of drugs while under the direct supervision of his mother; that he stated he had been left to sleep in a car while his mother worked at a bar; and that he had been left with drug dealers while his mother and his former stepfather, Homer Ray Dickens, had gone off for several days. Ms. Tademy stated that her testimony came from interviews with Blake and Mrs. Duck, and from the records of medical facilities which had treated Blake[2].
In sum, she opined that Blake was well cared for and well adjusted in the Duck home and to remove him from that environment for any reason would be detrimental.
While Mrs. Willis admitted both using drugs and that Blake possibly observed her doing so, she denied that Blake, himself, had been exposed to or given drugs, *715 left to sleep in the car while she worked or left with drug dealers in "Slick Log." She also admitted having a juvenile record. Mrs. Willis adamantly asserted that she was a changed woman and hadn't used any drugs in the last eighteen months to two years. She testified that after she turned Blake over to her sister, she went through rehabilitation[3], had a relapse and then found religion. She stated that she now attends church three to four times a week and that it is religion which keeps her off drugs.
Mrs. Willis, who is twenty-nine years old married Oscar K. Willis, a sixty year old divorcee, some eight months ago. They reside in Mr. Willis home where Mrs. Willis cares for her two other children, Joseph, age two and Matthew, age three. Joseph is illegitimate and Matthew was fathered by Homer Ray Dickens. She stated she has no trouble caring for her young children and that having Blake in the home would pose no problem. This testimony was supported by that of Mr. Willis and Mrs. Willis's mother, Nancy Mayon, and her sister, Donna Morris. Mrs. Willis's attendance at church was verified by her pastor, Reverend Daniel Toups.
All of Mrs. Willis's witnesses but one were "family" members. Their testimony was supportive of Kimberly Willis and negative as to Carron Duck. We note, however, that Mrs. Willis, Mrs. Mayon and Mrs. Morris are all estranged from Mrs. Duck.
Mrs. Duck testified on her own behalf. She stated that when Blake first came to live with them, he was very fearful and exhibited aggressive and sexually inappropriate behavior. Because of this they sought treatment for Blake at Briarwood Mental Health Center. Briarwood later changed its name to Crossroads. Blake was also seen at the mental health center in Alexandria (this turned out to be too far away to be practical) and at Goodin (which was too expensive). He is currently being seen at The Wellness Center. She stated that Blake is fearful of being returned to his mother and that after contact with her he has hallucinations and nightmares. She said that Blake is well adjusted, doing well in his school work (all of the Duck children are home schooled) and gets along with the other members of the family. Blake and her eleven year old son share a room and behave as typical brothers would behave. She stated that she loves Blake and would do whatever she could to keep Blake from being returned to his mother.
Ms. Jacqueline Coats, a retired school teacher with over twenty years of experience and who is licensed in Ohio, Texas and Louisiana, teaches the Duck children. She testified as to the cleanliness of the Duck home, the treatment of Blake by the Ducks as a member of the family, and Blake's satisfactory academic achievement. When asked to describe Blake's treatment in the Duck household, she responded "Perfect."
At the close of Defendant's case a stipulation was entered into by the parties that if Luther Duck was called to testify, his testimony would essentially be the same as that of Mrs. Duck; and that if Dorothy Shaffer and Jennifer Bennett were called to testify, they would testify essentially the same as Ms. Coats.
It is well settled in Louisiana law and jurisprudence that "A trial court's determination regarding child custody is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion. Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365." Kroics v. Kroics, 97-911, *716 p. 2 (La.App. 3 Cir. 2/4/98); 705 So.2d 1302, 1304.
Considering all the evidence, we cannot say the trial judge was clearly wrong in his decision to deny a change of custody. Clearly, Plaintiff failed to carry her burden of proof. As to the trial judge's decision not to order visitation, we likewise find no clear error. While we recognize the paramount right a parent has to maintain a relationship with his/her child, that right cannot be maintained when the evidence indicates that the harm such a relationship is likely to produce far outweighs any advantage it would afford the child.
Accordingly, for the reasons stated above, the judgment of the district court is affirmed. All costs of this appeal are taxed against Appellant, Kimberly Mayon Lovas Willis.
AFFIRMED.
NOTES
[1] The court in Griffith v. Roy, 269 So.2d 217, 263 La. 712 (La.1972) at 222 (citations and footnotes omitted) stated:

Our courts consistently look through the caption, style, and form of pleadings to determine from the substance of the pleadings the nature of the proceeding. This grandfather's suit here was in fact an attempt to have the mother declared unfit and the children declared neglected. The manner in which the grandfather's suit is styled is of no moment. Here was an attempt by a third party to declare children `neglected' under Constitution Article VII, Section 52. Only the State could exercise that right (although a third party's affidavit may motivate the State to institute such a proceeding, R.S. 13:1574), and then in the juvenile court. A third person cannot by means of the style and form of a petition deprive the juvenile court of its exclusive jurisdiction over neglected children. The district court, lacking jurisdiction, was incompetent to act in the proceedings filed by the grandfather. Therefore the adjudication granting custody of the children to the grandfather is null, void, and without effect.
[2] Blake has been diagnosed as having Attention Deficit Disorder (ADD) and Post Traumatic Stress Syndrome, both as a result of early childhood exposure to drugs and abuse.
[3] Nancy Bushnell, a substance abuse counselor employed by the State, testified that her search of the records from both Oprada, where Mrs. Willis claimed to have gotten treatment, and the Red River in-patient treatment facility revealed no record of Plaintiff receiving treatment.